Airey v State of New York (2025 NY Slip Op 25054)

[*1]

Airey v State of New York

2025 NY Slip Op 25054

Decided on March 3, 2025

Supreme Court, Albany County

Farrell, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 3, 2025
Supreme Court, Albany County

Donald M. Airey, individually and in his official capacity as SUPERVISOR of the TOWN OF BLENHEIM, STEPHEN WEINHOFER, individually and in his official capacity as SUPERVISOR of the TOWN OF BROOME, JOHN H. LEAVITT, individually and in his official capacity as SUPERVISOR of the TOWN OF CARLISLE, WERNER T. HAMPEL, individually and in his official capacity as SUPERVISOR of the TOWN of COBLESKILL, WILLIAM A. FEDERICE, individually and in his official capacity as SUPERVISOR of the TOWN OF CONESVILLE, EARL VANWORMER III, individually and in his official capacity as SUPERVISOR of the TOWN of ESPERANCE, PHILIP SKOWFORE JR., individually and in his official capacity as SUPERVISOR of the TOWN of SULTON, ALICIA A. TERRY, individually and in her official capacity as SUPERVISOR of the TOWN OF GILBOA, MARGARET HAIR, individually and in her official capacity as SUPERVISOR of the TOWN OF JEFFERSON, JOHN PAUL YOUMANS, individually and in his official capacity as SUPERVISOR of the TOWN OF MIDDLEBURGH, JEFFREY HASLUN, individually and in his official capacity as the SUPERVISOR of the TOWN OF RICHMONDVILLE, ALAN TAVENNER, individually, EARLIN ROSA, individually and in his official capacity as SUPERVISOR of the TOWN OF SEWARD, SANDRA R. MANKO, individually and in her official capacity as SUPERVISOR of the TOWN OF SHARON, HAROLD VROMAN, individually and in his officially and in his official capacity as SUPERVISOR of the TOWN OF SUMMIT, ALEX K. LUNIEWSKI, individually and in his official capacity as SUPERVISOR of the TOWN OF WRIGHT, CYNTHIA A. WEST, individually, and BENJAMIN J. OEVERING, individually and in his official capacity as SUPERVISOR of the TOWN OF SCHOHARIE, Petitioners-Plaintiffs, 
 For a Judgment Pursuant to Article 78 of the Civil Practice Law and Rules ("CPLR") and a Declaratory Judgment Pursuant to Section 3001 of the CPLR

against
The State of New York, KATHLEEN C. HOCHUL, in her official capacity as the Governor of the State of New York, THE NEW YORK STATE SENATE, and THE NEW YORK STATE ASSEMBLY, Respondents-Defendants.

Index No. 903991-24

Petitioners: Dylan C. Harris, Esq. - Whiteman, Osterman & Hanna, LLP
Respondents: Lauren R. Rosenberg, Esq. - Office of the New York Attorney General

James R. Farrell, J.

The following papers numbered 1 to 16 were read on this hybrid Article 78 and declaratory judgment action and Defendant's cross-motion for summary judgment:
PAPERS      
NUMBERED
Order to Show Cause, Petition with Exhibit A; Harris Affirmation in Support with Exhibits A-C 1-3
Notice of Motion, Memorandum of Law in Support, Answer in Special Proceeding, Lake Affirmation; Eversley Affirmation with Exhibits 4-8
Harris Affirmation in Opposition to Motion with Exhibits A-D 9
Harris Affirmation in Support of the Proper Application of the Discounted Cash Flow Approach to Value with Exhibits A-H 10
Respondent's Memorandum of Law, Gill Affidavit with Exhibit A, St. Germain Affidavit with Exhibits A-E 11-13
Petitioner's Post-Hearing Memorandum of Law 14
Respondent's Post-Hearing Memorandum of Law, Eversley Affirmation with Exhibit A 15-16
Petitioners, a group of town supervisors, in their official and individual capacities, and two individuals, all residing in the County of Schoharie, commenced this hybrid CPLR Article 78 and declaratory judgment action seeking a judgment declaring Real Property Tax Law ("RPTL") §575-b unconstitutional. Defendants cross move for summary judgment seeking dismissal of the petition based upon lack of standing, or in the alternative, seeking a declaratory judgment in their favor on the constitutionality of RPTL §575-b.
Background and Procedural History
Enacted in 2021, RPTL §575-b requires that the assessed value of solar and wind energy systems with a nameplate capacity equal to or greater than one megawatt shall be determined by a discounted cash flow approach ("DCF") (see RPTL §575-b[1] and [3]). The New York State Department of Taxation and Finance ("DTF"), in consultation with the New York State Energy Research and Development Authority ("NYSERDA") and the New York State Assessors Association, are responsible for identifying, formulating, and publishing an appraisal model and a discount rate or rates (see RPTL §575-b[1][a][b][c]). The statute further requires DTF to publish the discount rate(s) in preliminary form on its website with notice to parties who have requested it, and to allow for a public comment period of 60 days (see RPTL §575-b[1][b]). DTF is authorized to consider economic and cost characteristics of solar and wind energy systems located in different geographic regions and consider regional market pressures in the formulation [*2]of the appraisal model and discount rate(s) (see RPTL §575-b[1][c]). The statute also authorizes DTF to periodically update the discount rate(s) to be used (see RPTL §575-b[1-a]). Subsection 4 of the statute sets forth the procedure for filing of complaints with respect to assessments, and further provides that actions or proceedings challenging the validity and accuracy of the appraisal model or discount rate(s) established under RPTL §575-b are to be brought by an Article 78 proceeding against the commissioner of DTF in the Appellate Division, Third Department.
On or about August 2, 2021, DTF released a preliminary appraisal model, which was subject to public comment through October 1, 2021. A revised appraisal model was thereafter released on or about October 13, 2021. After correcting an alleged computational error with the revised appraisal model, a final model was published on DTF's website on or about January 6, 2022 ("the 2022 Model").
Subsequently, in or about April 2022, a group of New York State municipalities [FN1]
brought a hybrid CPLR Article 78 and declaratory judgment action against DTF and its commissioner challenging the development and promulgation of an assessment model under RPTL §575-b on the grounds that the respondents in that case failed to substantially comply with the provisions of the New York State Administrative Procedure Act ("SAPA"). Supreme Court granted a temporary restraining order enjoining DTF and its commissioner from taking any actions to implement, or to direct the implementation of the 2022 Model, and enjoining assessors and assessing units from being bound by use of the 2022 Model. However, prior to a determination on the merits, the New York State Legislature amended SAPA and RPTL §575-b in order to moot the lawsuit and the injunction granted by the Court. The legislation, signed into law by the Governor, obviated SAPA with respect to RPTL §575-b (see RPTL §575-b[1-a]).
With SAPA obviated and eliminated, on or about December 28, 2023, DTF published an "unlocked" preliminary 2024 appraisal model for public comment, which allowed the public to see the various calculations within the model that produced assessed value. The public comment period closed on February 27, 2024. Respondents assert, and Petitioners do not dispute, that none of the Petitioners to this proceeding submitted comments during the public comment period. Following closure of the public comment period, adjustments were made to the appraisal model and a final version ("the 2024 Model") was released in or about March 2024, at least 30 days before the May 1, 2024 tentative assessment roll.
Thereafter, Petitioners commenced the instant action by filing an order to show cause and verified petition-complaint on April 24, 2024 challenging the constitutionality of the statute. The Court (Corcoran, J.) denied Petitioners request for a temporary restraining order. On May 17, 2024, Respondents filed a verified answer and simultaneously moved for summary judgment dismissing the complaint/petition on the ground that Petitioners lack standing, or, in the alternative, seeking a declaration in their favor as to the constitutionality of the statute.
Instant Proceeding
Petitioners raise several constitutional challenges to RPTL §575-b. First, Petitioners argue that the statute unconstitutionally infringes upon the constitutional and statutory rights and obligations of assessors to value property within their jurisdiction in a manner not to exceed full [*3]value. Petitioners assert that assessors have the ultimate authority to select the appropriate method for assessing and valuing property within their jurisdiction and that the Legislature cannot impose a specific formula or methodology thereby curtailing the judgment of assessors. Second, Petitioners argue that the Legislature's enactment of RPTL §575-b is an unlawful delegation of the Legislature's taxing authority. Petitioners argue the Legislature unconstitutionally delegated to an unelected administrative agency, DTF, the power to develop and implement an appraisal model, which will determine the tax burden placed on a particular solar or wind energy system with a nameplate capacity equal to or greater than one megawatt. Petitioners further argue that the Legislature failed to enact reasonable safeguards and standards for DTF to develop the assessment model. Third, Petitioners contend that the statute violates the equal protection and due process rights of similarly situated wind and solar energy systems. Petitioners argue that the statute creates an arbitrary and capricious division between solar and wind energy systems capable of producing more or less than one megawatt. Fourth, Petitioners claim that RPTL §575-b violates the equal protection and due process rights of similarly situated renewable power generation facilities because it arbitrarily and capriciously treats them differently for real property tax assessment purposes without a rational basis for doing so. Last, Petitioners assert that the statute is arbitrary and capricious because it shifts the tax burden from solar and wind energy systems with greater than one megawatt capacity to Petitioners and other taxpayers within the tax levying jurisdiction and/or results in a cut in local government services to offset the loss in tax revenue caused by implementation of the model used under RPTL §575-b.
In response, Respondents filed a motion for summary judgment with respect to Petitioners' declaratory judgment action based upon Petitioners alleged lack of standing. Respondents argue that other than the Town of Sharon, none of the other municipalities has a wind or solar facility affected by the statute. Respondents further contend that Petitioners have failed to allege definitive harm. They further claim that Petitioners lack common-law taxpayer standing because the statute is not insulated from judicial review since a taxpayer with an eligible solar or wind facility could assert a claim. Respondents further claim that Petitioners lack standing to assert constitutional challenges on behalf of assessors, similarly situated wind and solar generation facilities or similarly situated renewable energy generation facilities. Next, Respondents argue that Petitioners cannot meet the burden required to declare RPTL §575-b unconstitutional. They contend that the tax assessor is a statutorily created office and that the Legislature is within its authority to direct assessors to use an assessment method that embodies the Legislature's policy choices. Respondents further argue that RPTL §575-b is not a delegation of taxing power to DTF because DTF is not levying a tax but implementing the Legislature's tax policy. Respondents also contend that the Legislature's policy objective in enacting RPTL §575-b has a rational basis and that there are conceivable bases for the classifications selected. Last, Respondents argue that Petitioners' Article 78 proceeding is an inappropriate vehicle to challenge the constitutionality of the statute and therefore, should be dismissed. 
In reply, Petitioners argue that they have common-law taxpayer standing as each of them is a taxpayer in the County of Schoharie and the shifting of the tax burden in the Town of Sharon will cause a correlating shift of the tax burden within the County to other town residents. Petitioners further argue that they have common-law taxpayer standing as tax-paying residents of the State of New York. They further argue that they have asserted an injury in fact because they will suffer an increase in their tax burden due to the promulgation of the 2024 Model and [*4]the placing of the solar generating facility in the Town of Sharon on the assessment roll for 2024. Petitioners next argue that Respondents have failed to submit evidentiary proof to support their motion for summary judgment because the affirmation submitted in support of the motion is not by an individual with personal knowledge of the facts.
Oral argument was heard on September 30, 2024. Following oral argument, a hearing was held on November 25, 2024. Prior to the hearing, the Court permitted the parties to brief the issue of whether DTF acted within the scope of authority granted to it by the Legislature in creating the 2024 Model. Both parties submitted memorandums of law with accompanying exhibits (hereinafter referred to as "prehearing submissions").
In their prehearing submissions, Petitioners argued that in creating the 2024 Model, DTF failed to take certain factors into consideration which resulted in significantly decreased revenue causing wind and solar systems to be undervalued by millions of dollars. More specifically, Petitioners argued that the 2024 Model failed to take into account investment tax credits ("ITCs"), bonus depreciation and accelerated depreciation, and renewable energy credits ("RECs"). Petitioners contend that without proper guidance from the Legislature, DTF cherry picked which revenue streams to use in the 2024 Model resulting in an improper DCF methodology. Petitioners further contend that DTF failed to provide survey data relied upon by its consultant, Levitan Associates, in arriving at the discount rate used, and therefore, it cannot be confirmed that DTF used local New York data to arrive at the discount rate used.
In their pre-hearing submissions, Respondents argued that DTF developed the 2024 Model and discount rates within the constraints set for by the Legislature in the statute. Respondents acknowledge that environmental values ("e-values"), such as RECs and ITCs, are credits, benefits, emissions reductions, environmental air-quality credits and emissions-reduction credits, offsets, and allowances resulting from the avoidance of the emission of a gas, chemical, or other substance attributable to a renewable energy project. Respondents stated that the draft 2022 Model included e-values as revenue streams, but in response to "extensive" public comment, and in consultation with NYSERDA and DTF's Counsel's Office, DTF changed course and excluded e-values as revenue streams in its DCF analysis. Respondents contend that e-value revenue streams, while appropriately considered in valuing the renewable energy business, are not proper revenue streams when valuing the real property. Finally, Respondents contend that pursuant to RPTL §575-b, the validity and accuracy of the 2024 Model cannot be challenged in Supreme Court, and that any challenge to the validity and accuracy of the 2024 Model must be brought in the Appellate Division, Third Department.
Thereafter, a hearing was held on November 25, 2024. Petitioners called Glenn Walker, their expert witness in the field of appraisal and valuation including discounted cash flow valuations for solar and utility assets. Mr. Walker assisted in the appraisal of the Town of Sharon solar project, East Point Energy Center, while working for George E. Sansoucy PE, LLC. Mr. Walker testified that there are three approaches to establishing value recognized by the appraisal profession: cost approach, sales comparison approach, and income capitalization approach. Using the analogy of a three-legged stool, Mr. Walker indicated that appraisers consider the three valuation approaches as a form of checks and balances. Each approach should render a value that is not dramatically different than the other approach. If each approach renders a similar value, then one can be more certain of the validity of the valuation. He testified that in valuing the Town of Sharon facility he utilized the cost approach and income capitalization approach. He indicated that a sales comparison approach was not developed based on the lack of [*5]sales of comparable solar facilities.
Mr. Walker testified that because the Town of Sharon facility was a newly constructed facility, he examined the cost to replace the facility to determine a cost approach value, which was approximately $107 million dollars. Mr. Walker testified that the income capitalization approach captures the present value for future benefits associated with owning the facility. He testified that the income capitalization approach can be done using the discounted cash flow analysis or a direct capitalization analysis. In valuing the Town of Sharon facility, Walker used the discounted cash flow ("DCF") analysis, as mandated by the Legislature. Mr. Walker testified that it is important to account for renewable energy credits ("RECs") granted by the state, and investment tax credits ("ITCs") provided for in the Internal Revenue Code when using the discounted cash flow approach because they are significant sources of revenue associated with a solar or wind facility. Mr. Walker indicated that RECs are part of the revenue stream associated with renewable energy generated by the real property. The DCF assessed value Walker obtained for the Town of Sharon facility was $99,142,000.00 dollars. Mr. Walker testified that by failing to include ITCs the cash flows associated with the Town of Sharon facility would be decreased by $25 to $30 million dollars. He further testified that failure to account for RECs in cash flows would result in a shortfall of approximately 40% to 45% of the revenue available to the Town of Sharon facility. He testified that the impact of failing to include RECs in the valuation of the Town of Sharon facility equated to approximately $3 million dollars per year. He explained that to omit RECs from the revenue stream would result in an undervalued estimate of revenue and income for the facility. Mr. Walker testified that in his expert opinion, failure to include RECs and ITCs as cash flows results in an income shortfall and inaccurate DCF valuation. Mr. Walker testified that the 2024 Model fails to employ a proper DCF analysis because it fails to account for ITCs, bonus depreciation, and RECs available to renewable energy facilities resulting in a substantial income shortfall. He further testified that RECs are inextricably intertwined to the real estate because "you cannot have renewable energy credits unless a facility certified as a renewable energy generating facility produces a megawatt, which then mints that renewable energy credit . . . ..the renewable energy credits are generated by the facility and therefore intrinsically intertwined." Mr. Walker explained that a renewable energy certificate cannot be minted without the generation of a megawatt of electricity by the facility located on the real property. The renewable energy certificates can then, either be sold "bundled" with the electricity that is produced, or "unbundled" and sold separately from the electricity produced. In either instance, Mr. Walker testified that the RECs should be accounted for as revenue. He further testified that RECs are not intangible assets and cited the Dictionary of Real Estate Appraisal (Appraisal Institute); the Appraisal of Real Estate 14th edition (Appraisal Institute); Valuing Machinery and Equipment (American Society of Appraisers); and Black's Law Dictionary in support thereof.
Kevin Gill, Project Manager 3, from DTF's Office of Real Property and Tax Services, testified on behalf of Respondents. Mr. Gill testified that DTF consulted with Levitan Associates, an appraisal firm, NYSERDA and the New York State Assessor's Association in developing the 2024 Model. He testified that in developing the model, "qualified revenue streams" were considered, less operating expenses to determine a net-operating income and a discount rate was applied over a 25-year holding period. The 25-year holding period was based upon the warranty period of the solar panels. Mr. Gill further testified that the model applies 11 NYISO zones for geographic regions and the eleven major utility companies in New York in [*6]order to account for geographic-economic characteristics. He also testified that the model took regionalized market pressures into account by examining operating expenses in different sectors so that a blanket unit of measure for operating expenses is not applied. Mr. Gill acknowledged that the difference in the appraisal value reached by the Town of Sharon in its application of the 2024 Model ($22.5 million dollars) and the appraised value reached by Mr. Walker ($99 million dollars) is because RECs and ITCs were not considered revenue as part of the 2024 Model by DTF. Mr. Gill testified that DTF determined that RECs and ITCs were intangible revenue streams and thus could not be included in the DCF analysis because doing so would run afoul of Article 16, Section 3 of the New York State Constitution.[FN2]
Mr. Gill testified that the 2022 Model initially included RECs as tangible assets, but after receiving public comments, primarily from solar and wind developers and renewable energy advocates requesting that RECs not be included as part of the appraisal model, they were excluded. He testified that RECs met the four tests for identifying intangible assets as set forth by the International Association of Assessing Officers. However, he testified that the New York State Assessors Association and other assessor groups specifically requested that RECs and ITCs be included as revenue in the appraisal model. More specifically, the New York State Assessors Association filed a comment on or about November 20, 2023, and urged DTF to include "New York State and Federal energy credits, subsidies, grants, and other incentives to build solar" in determining cash flow for the model. Mr. Gill testified that after consultation with NYSERDA, Levitan Associates, and DTF's Counsel's Office, DTF ultimately removed RECs and ITCs from the 2024 Model.
Michael St. Germain, Real Property Analyst 3 from DTF's Office of Real Property Tax Services, testified on behalf of Respondents. Mr. St. Germain testified generally about the functionality of the 2024 Model and each of the various inputs. Mr. St. Germain testified that the initial inclusion of RECs in the 2022 Model was a carry-over from how hydro-electric plants were being appraised. He testified that RECs are included as part of the revenue stream for hydro-electric plants. He further testified that while RECs were removed as revenue from solar and wind facility appraisals, they had not yet been removed from hydro-electric plant appraisals. Mr. St. Germain testified that whether RECs should be included as revenue turned on a legal question as to whether RECs were tangible or intangible assets.[FN3]
He stated that DTF's Counsel's Office determined that RECs were an intangible asset and therefore could not be considered revenue. He further testified that moving forward, DTF planned to remove RECs from appraisals for hydro-electric plants as well, but DTF had not done so yet.
Following the hearing, the parties submitted post-trial memorandum on January 13, 2025. The Court has reviewed all of the parties' submissions and the matter is now fully submitted for the Court's consideration.
Legal Analysis
CPLR Article 78 Proceeding
As an initial matter, the Court will first address Respondents' argument that Petitioners cannot challenge the constitutionality of RPTL §575-b via a CPLR Article 78 proceeding, which Petitioners have not disputed.
"While an article 78 proceeding is generally the proper vehicle to determine whether a statute, ordinance, or regulation has been applied in an unconstitutional manner, the rule is different when the issue is the constitutionality of legislative action. [The Court of Appeals] ha[s] consistently held that a proceeding under article 78 is not the proper vehicle to test the constitutionality of legislative enactments" (Kovarsky v Hous. and Dev. Admin. of City of New York, 31 NY2d 184, 191-92 [1972] [internal citations omitted]; see Matter of Carney v New York State Dept. of Motor Vehicles, 133 AD3d 1150, fn. 1 [3d Dept 2015], affd sub nom. Matter of Acevedo v New York State Dept. of Motor Vehicles, 29 NY3d 202 [2017]; see also Byrnes v Senate of State of New York, 2024 NY Slip Op 03351 [4th Dept June 18, 2024], appeal dismissed, 2024 NY Slip Op 70811 [Ct App July 11, 2024]). Consequently, an Article 78 proceeding is not the proper form for reviewing Petitioners' constitutional challenges to RPTL §575-b; and the Article 78 proceeding is dismissed on this ground.
Standing
Next, Respondents argue that Petitioners lack standing because (1) they have not alleged an injury in fact; (2) they cannot bring claims on behalf of another party; and (3) they do not have common-law taxpayer standing. In opposition, Petitioners contend that they have sufficiently alleged an injury in fact to grant them standing because the placement of the facility on the Town of Sharon tax roll will "undoubtedly shift a demonstrably higher tax burden onto residents of the Town" and upon residents in the County of Schoharie.
Third-Party Standing
As an initial matter, Petitioners do not dispute that they lack standing to bring an action on behalf of another. "While generally a party has no standing to raise the legal rights of another, a party establishes third-party standing when (1) there is a substantial relationship between the party asserting the claim and the rightholder; (2) it is impossible for the rightholder to assert his or her own rights; and (3) the need to avoid a dilution of the parties' constitutional rights" (see Fleischer v New York State Liq. Auth., 103 AD3d 581, 583 [1st Dept 2013]). Here, Petitioners lack standing to assert claims on behalf of assessors, similarly situated wind and solar energy systems or similarly situated renewable energy generation facilities as these groups could bring their own action challenging the constitutionality of RPTL §575-b. "[T]he mere fact that a party that could assert standing lacks any motivation to do so does not in turn convey standing to others who do not otherwise have a tangible interest in the government conduct at issue (61 Crown St., LLC v City of Kingston Common Council, 221 AD3d 1090, 1095-1096 [3d Dept 2023]). Accordingly, Petitioners' first, third and fourth causes of action asserting claims on behalf of these groups are dismissed for lack of standing.
Common-Law Taxpayer
Similarly, Petitioners have failed to dispute that RPTL §575-b is not insulated from judicial review, which would afford them common-law taxpayer standing. "With the enactment of State Finance Law § 123—b, as a general rule, the statutory test for determining taxpayer standing will be determinative" (New York State Ass'n of Small City School Districts, Inc. v State, 42 AD3d 648, 651 [3d Dept 2007]). Common-law taxpayer standing is "a remedy for taxpayers to challenge important governmental actions, despite such parties being otherwise insufficiently interested for standing purposes, when the failure to accord such standing would be in effect to erect an impenetrable barrier to any judicial scrutiny of legislative action" (Matter of Colella v Bd. of Assessors of County of Nassau, 95 NY2d 401, 410 [2000]; see also id.). Here, the Legislature's enactment of RPTL §575-b is not insulated from judicial review if petitioners [*7]are denied taxpayer standing given that other individuals, such as owners of solar and wind energy systems or taxpayers in a town with a solar or wind energy system on the tax assessment roll who experienced an increase in their tax burden as a result of the implementation of RPTL §575-b could challenge the statute (see Matter of Assn. For A Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 97 AD3d 1085, 1086 [3d Dept 2012], affd as mod, 23 NY3d 1 [2014] [finding that availability of theoretical plaintiffs defeats a claim of common-law taxpayer standing]; New York State Ass'n of Small City School Districts, Inc. v State, 42 AD3d at 651).[FN4]

"Injury in Fact"
Petitioners have, however, sufficiently alleged an injury in fact to afford them standing to challenge RPTL §575-b. "Standing is a threshold determination which is not bestowed simply because the matter sought to be adjudicated is one of important public concern. Instead, standing requires an actual legal stake in the outcome of the proceeding/action or, in other words, an injury in fact worthy and capable of judicial resolution" (Matter of LaBarbera v Town of Woodstock, 29 AD3d 1054, 1055 [3d Dept 2006] [citations omitted]; see 61 Crown St., LLC v New York State Off. of Parks, Recreation and Historic Preserv., 207 AD3d 837, 839 [3d Dept 2022]). "Petitioners must demonstrate that they will suffer a concrete and identifiable injury, rising beyond mere conjecture or speculation, and the injury-in-fact must be different in kind and degree from the community generally" (61 Crown St., LLC, 207 AD3d at 839 [internal citations and quotation marks omitted]). "Petitioners bear the burden of showing that they suffered an injury-in-fact and that the claimed injury is within the zone of interests sought to be promoted by the statute or constitutional provision" (Curry v New York State Educ. Dept., 163 AD3d 1327, 1329 [3d Dept 2018]). "While the requirement of injury in fact for standing purpose is closely aligned with [the judiciary's] policy not to render advisory opinions, [the courts] have also cautioned that standing rules should not be applied in an overly restrictive manner where the result would be to completely shield a particular action from judicial review" (Stevens v New York State Div. of Criminal Justice Services, 40 NY3d 505, 515 [2023] [internal quotations and citations omitted]).
Here, while Respondent argues that injury in fact cannot be found in the circumstances presented, they appear to concede that the reason it cannot be found is because the Town of Sharon facility has not yet been assessed under the 2024 Model or under any other assessment method. However, Petitioners have sufficiently alleged that the Town of Sharon will suffer a tangible $3.3 million dollar loss in tax revenue as the assessed value of the solar facility in its town is $77 million dollars less based upon application of RPTL §575-b through the 2024 Model created by DTF, as opposed to using a standard DCF methodology. "Judicial consideration of [Petitioners'] claim seeking a declaration as to the unconstitutionality of [RPTL §575-b] should not require that [they] first experience the harm [they] seek[] to avoid by challenging the [statute]" (New York Univ. v City of New York, 2024 NY Slip Op 04183, *4 [1st Dept 20204]).
"The fact that the court may be required to determine the rights of the parties upon the happening of a future event does not mean that the declaratory judgment will be merely advisory . . . . A distinction has been made between those cases in which the likelihood of a future event is controlled by the action or inaction of some third party and is, therefore, wholly speculative and abstract and those cases in which the future event is an act contemplated by one of the parties, [and] it is assumed that the parties will act in accordance with the law and thus the court's determination will have the immediate and practical effect of influencing their conduct" (Hussein v State, 81 AD3d 132, 135-36 [3d Dept 2011], affd, 19 NY3d 899 [2012]).
The immediate and significant loss of tax revenue as a result of the application of the 2024 Model to determine the assessed value of the facility in the Town of Sharon is "harm that is not tenuous, ephemeral, or conjectural, but is sufficiently concrete and particularized to warrant judicial intervention" (New York Univ. v City of New York, 2024 NY Slip Op 04183, *4). Thus, at a minimum, the Town of Sharon Supervisor has sufficiently established standing to challenge the constitutionality of the Legislature's enactment of RPTL §575-b, and the Court will consider Petitioners' second and fifth causes of action.
Delegation of Legislature's Authority to Tax
Petitioners contend that the Legislature unlawfully delegated its authority to tax to DTF and therefore RPTL §575-b is unconstitutional. Petitioners argue that the Legislature failed to provide sufficient guidance in its enactment of RPTL §575-b and left it to DTF's unfettered discretion to determine which revenue streams would or would not be included when developing the model the statute directs to be established.[FN5]
Respondents assert that the Legislature did not delegate its authority to tax to DTF because it is within the Legislature's power to designate the method of valuation to be used and because the Legislature provided sufficient factors for DTF to consider when developing the model. Respondents argue that DTF appropriately evaluated information provided during the public comment period, as directed by the Legislature, in determining to exclude RECs and ITCs from the 2024 Model.
In this case, the Legislature, through its enactment of RPTL § 575-b, provided for the taxation of solar and wind energy systems with a nameplate capacity equal or greater than one megawatt and proscribed that the assessed value of these systems shall be determined by a discounted cash flow approach that includes an appraisal model identified and published by DTF (see RPTL § 575-b [1][a]). The statute further provides that DTF must identify the appraisal model in consultation with NYSERDA and must consult with the New York State Assessors Association (see RPTL § 575-b[a] and [c]). In determining the discount rate, DTF must publish the proposed rate and allow for sixty days of public comment (see RPTL § 575-b [1][b]). Finally, DTF is empowered to "take into account economic and cost characteristics of such solar [*8]and wind energy systems located in different geographical regions of the state and consider regionalized market pressures in the formulation of the appraisal model and discount rates . . . ." (RPTL § 575-b [1][c]). No other guidelines or parameters were provided or proscribed by the Legislature. During oral argument Respondents admitted that RPTL § 575-b was passed through a budget bill without any debate, discussion or hearings by the Legislature.
Discounted cash flow, also known as the income capitalization approach, is a tool used by appraisers to calculate the present value of a property by examining revenues and expenses and, as relevant here, valuing a solar energy system for real property taxation. It is axiomatic that the higher a property's assessed value, the higher the tax the property owner will pay and the lower the assessed value, the lower the tax the taxpayer will pay. As such, assessed value is integral to the amount of tax a taxpayer must pay. Indeed, the assessed value determines "upon what property" the tax is levied (Greater Poughkeepsie Lib. Dist. v Town of Poughkeepsie, 81 NY2d 574, 580 [1993]).
"The power to tax, of course, lies solely with the Legislature" (Greater Poughkeepsie Lib. Dist. v Town of Poughkeepsie, 81 NY2d at 579; NY Const., art. III, §1; art. XVI, §1; Sonmax, Inc. v. City of New York, 43 NY2d 253, 257 [1977]). The power to tax "may not, however, be delegated to administrative agencies or other governmental departments" (Id. citing Gautier v Ditmar, 204 NY 20,27-28 [1912]). Indeed, the Court of Appeals has held that "it would be incompetent for the legislature to leave to a state officer or department the power to determine whether a tax should be levied, or at what rate, or upon what property" (Greater Poughkeepsie Lib. Dist., 81 NYd at 580, quoting Gautier v Ditmar, 204 NY at 28). "Legislative enactments enjoy a strong presumption of constitutionality and parties challenging a duly enacted statute face the initial burden of demonstrating the statute's invalidity beyond a reasonable doubt" (Delgado v State, 194 AD3d 98, 103 [3d Dept 2021], affd, 39 NY3d 242 [2022] [internal quotation marks and citation omitted]). "While the Legislature cannot delegate its lawmaking functions to other bodies, there is no constitutional prohibition against the delegation of power to an agency or commission to administer the laws promulgated by the Legislature, provided that power is circumscribed by reasonable safeguards and standards" (Ctr. for Jud. Accountability, Inc. v Cuomo, 167 AD3d 1406, 1410 [3d Dept 2018] [internal quotation marks and citations omitted], appeal dismissed 33 NY3d 993 [2019] and lv denied 34 NY3d 961 [2019]).
This Court is guided by the principles laid out by the Court of Appeals in Levine v Whalen, 39 NY2d 510, 515 (1976):
The Legislature may constitutionally confer discretion upon an administrative agency only if it limits the field in which that discretion is to operate and provides standards to govern its exercise. This does not mean, however, that a precise or specific formula must be furnished in a field where flexibility and the adaptation of the legislative policy to infinitely varying conditions constitute the essence of the program. The standards or guides need only be prescribed in so detailed a fashion as is reasonably practicable in the light of the complexities of the particular area to be regulated, since necessity fixes a point beyond which it is unreasonable and impracticable to compel the Legislature to prescribe detailed rules. Indeed, in many cases, the Legislature has no alternative but to enact statutes in broad outline, leaving to administrative officials enforcing them the duty of arranging the details. More to the point, it is not always necessary that license legislation prescribe a specific rule of action and, where it is difficult or impractical for [*9]the Legislature to lay down a definite and comprehensive rule, a reasonable amount of discretion may be delegated to the administrative officials (internal citations omitted) (accord Stevens, 40 NY3d at 516-517).
Thus, the Court of Appeals has stated that "[s]o long as the legislature stays within [these] confines, it enjoys great flexibility in delegating rulemaking powers to administrative agencies in order to meet its policymaking ends. In fact, this flexibility is necessary to the law-making process" (Stevens, 40 NY3d at 517).
Here, the Petitioners have demonstrated the invalidity of RPTL §575-b beyond a reasonable doubt. The testimony and evidence before the Court firmly establish that the Legislature incompetently left it for DTF to determine whether "a tax should be levied, or at what rate, or upon what property" with respect to state and federal tax credits (Greater Poughkeepsie Lib. Dist., 81 NYd at 580) with respect to solar and wind energy systems. The Legislature failed to enact reasonable safeguards and standards in directing the assessment of solar and wind energy systems using a discounted cash flow approach. It is further clear from the evidence received, without reasonable safeguards and standards from the Legislature, DTF was granted discretionary authority to determine what revenue, income and expenses to include or exclude from the DCF approach, dramatically impacting the assessed value of these solar and wind systems and thereby determining what would and would not be taxed.
Petitioners and Respondents agree that the 2024 Model uses a discounted cash flow analysis and that the nearly $77 million dollar discrepancy between Mr. Walker's analysis and the 2024 Model analysis is the failure of the 2024 Model to account for RECs and ITCs. Essentially, the 2024 Model developed by DTF fails to account for all revenues while accounting for all expenses. This is not a minor inconsistency or minor disagreement. The difference is a magnitude of 340%. Indeed, the Petitioners' expert testified persuasively that the DCF analysis he used was corroborated by the cost approach valuation he developed, which resulted in an assessed value of $107 million dollars, ensuring that his data was valid and could be relied upon to determine assessed value. 
Respondents contend that RECs and ITCs should not be considered because only income directly attributable to the property itself, like rent, constitutes income, and not income derived from a business conducted on the property (see Matter of Barnum v Srogi, 54 NY2d 896, 898 [1981]). However, courts have recognized that "revenue generated from a property may be an appropriate consideration when the revenue is — like rent — inextricably tied to a specific parcel of real estate" (see Niagara Mohawk Power Corp. v Town of Moreau Assessor, 307 AD2d 669, 671 [3d Dept 2003]). As proscribed by RPTL § 487(1)(b) a "solar or wind energy system," subject to taxation by RPTL § 575-b(1), "means an arrangement or combination of solar or wind energy equipment designed to provide heating, cooling, hot water, or mechanical, chemical, or electrical energy by the collection of solar or wind energy and its conversion, storage, protection and distribution." Here, RECs cannot exist unless a solar or wind energy system certified as a renewable energy generating facility produces a megawatt of energy. The REC is then minted to create a renewable energy certificate, which can be sold together with the megawatt of energy created or separately. This revenue stream is inextricably tied to the real property upon which these solar and wind energy systems are situated and cannot exist without it.
Respondents point to RPTL §581-a and §592 as examples of the Legislature's constitutional delegation of taxing authority in selecting the type of valuation method to use for [*10]assessment purposes. These statutes pertain to the assessment of low-income housing and unit production values for gas and oil. However, a close look at these statutes shows that the Legislature did not incompetently delegate its taxing power, but instead put in place several guideposts when using a specific assessment approach, thereby limiting the field of the agency's discretion. While the Legislature directs that an income approach shall be used to assess the value of low-income housing, the Legislature also defines "net operating income" and specifically excludes income tax credits and other incentives provided to offset development costs as a form of income (see RPTL §581-a). That the Legislature considers tax credits as tangible assets subject to tax is evident by the Legislature's explicit exclusion of income tax credits with respect to assessments of low-income housing. If such tax credits were intangible assets not subject to taxation pursuant to the New York State Constitution, as Respondents suggest, then there would be no need for the Legislature to explicitly exclude them for revenue in these assessments. Similarly, while directing that a discounted net cash flow approach be used in determining unit of production values for gas and oil, the Legislature specifically outlines how gross income should be reduced and by what factors (see RPTL §592). Again, the Legislature set forth what would and would not be taxed and did not leave that determination to an administrative agency. 
Unlike these statutes, RPTL §575-b offers no direction as to what constitutes income, revenue, or expenses. The Legislature's failure to provide for what property should and should not be taxed and its failure to provide sufficient direction, standards and safeguards on the imposition of taxes on solar and wind energy facilities has created confusion and disarray with respect to how RECs and ITCs should be treated. Mr. Gill and Mr. St. Germain acknowledged that DTF initially included RECs and ITCs as a carry-over from the manner in which hydro-electric facilities are being assessed. It was not until after the public comment period for RPTL §575-b that DTF reconsidered their position. Direction from the Legislature is required by the Constitution as two opposing groups, renewable energy developers and advocates, and assessors, view very differently whether RECs and ITCs are tangible or intangible assets and whether they should or should not be taken into consideration when assessing solar and wind energy facilities. DTF cannot be guided by which stakeholder's argument prevails following a 60-day public comment period, instead, DTF must be guided by the Legislature, because, at its core, the Legislature may not delegate its power to tax — which it has clearly done here. RPTL §581-a and §592 are examples of how the Legislature specifically provided what property would and would not be taxed and proscribed reasonable safeguards and standards on how various forms of income, revenue, expenses, incentives and tax benefits should be treated for assessed valuation purposes. No such direction was provided here, and the result is significantly underassessed valuations. It is for the Legislature, not DTF, to determination whether RECs and ITCs should be taxed and included as part of the discounted cash flow approach for valuing solar and wind energy facilities.
For the foregoing reasons, the Legislature has abdicated its constitutional responsibility and has delegated its taxing power to an administrative agency in violation of the New York State Constitution (see NY Const., art. III, § 1; art. XVI, § 1; Greater Poughkeepsie Lib. Dist. V. Town of Poughkeepsie, 81 NY2d 574, 579 [1993]; Sonmax, Inc. v City of New York, 43 NY2d 253, 257 [1977]). According, the Court finds that RPTL §575-b is unconstitutional.
To the extent not specifically addressed, the Court has considered the parties' remaining arguments and finds them to be either academic or without merit.
Based upon the foregoing, it is hereby
ORDERED and ADJUDGED that Respondents' motion for summary judgment is granted in part to the extent that Petitioners' Article 78 proceeding is dismissed as an improper proceeding to challenge the constitutionality of RTPL §575-b and Petitioners' first, third and fourth causes of action are dismissed for lack of standing, and the motion is otherwise denied; and it is further
ORDERED, ADJUDGED and DECLARED that RPTL §575-b is unconstitutional.
The foregoing constitutes the Decision, Order and Judgment of the Court.
Dated: March 3, 2025
Monticello, NY
ENTER:
HON. JAMES R. FARRELL, A.J.S.C.
Pursuant to CPLR §5513, an appeal as of right must be taken within thirty days after service by a party upon the appellant of a copy of the judgment or order appealed from and written notice of its entry, except that when the appellant has served a copy of the judgment or order and written notice of its entry, the appeal must be taken within thirty days thereof.

Footnotes

Footnote 1:The petitioners in the previous proceeding are many of the same petitioners named in the instant proceeding.

Footnote 2:The New York State Constitution prohibits the ad valorem taxation of intangible property.

Footnote 3:No New York Court has addressed whether tax credits are intangible or tangible assets.

Footnote 4:The cases relied upon by Petitioners for the proposition that they have taxpayer standing, Prodell v State of New York, 222 AD2d 178 (3d Dept 1996) and Board of Educ., Shoreham-Wading Riv. Cent. School Dist. v State of New York, 111 AD2d 505 (3d Dept 1985) rely upon Boryszewski v Brydges, 37 NY2d 361 (1975), which was superseded by State Finance Law §123-b (see Wein v Comptroller, 46 NY2d 394 [1979]).

Footnote 5:The unfettered discretion at issue here is clearly on display as DTF originally included RECs in the revenue streams for solar and wind projects and, upon consulting with legal counsel after requests by renewable energy proponents, reversed course and eliminated them completely. It is notable that these revenue streams have previously been included and are currently utilized for the assessment of another form of renewal energy — hydro-electric. This highlights the inconsistency in the development of the 2024 Model herein.